DISCIPLINARY COUNSEL *v.* FRIEDMAN.

[Cite as *Disciplinary Counsel v. Friedman,*
114 Ohio St.3d 1, 2007-Ohio-2477.]

(No. 2006–2341—Submitted February 14, 2007—Decided June 6, 2007.)

---

**Per Curiam.**

{¶ 1} Respondent, Benjamin Stuart Friedman of Cincinnati, Ohio, Attorney Registration No. 0074348, was admitted to the Ohio bar in 2001.

{¶ 2} On April 21, 2006, relator, Disciplinary Counsel, filed an amended complaint charging respondent with professional misconduct. Respondent filed an answer to the complaint, and a panel of the Board of Commissioners on Grievances and Discipline held a hearing on the complaint in September 2006. The panel then prepared written findings of fact, conclusions of law, and a recommended sanction, all of which the board adopted.

Misconduct

*Count I*

{¶ 3} In early June 2004, Dawn Schmitz retained respondent to help her obtain custody of her children. Schmitz paid respondent a $2,000 retainer, which respondent deposited into his client trust account. Respondent told Schmitz that he would prepare the necessary paperwork for her right away.

{¶ 4} In late June 2004, Schmitz asked respondent about the status of her case. Respondent told her that his office had been burglarized and that he would prepare the necessary documents for her no later than the next week. When Schmitz did not receive the expected documents, she called respondent's office and left several messages, but respondent never returned the calls.

{¶ 5} On July 1, 2004, Schmitz sent respondent an e-mail inquiring about her case. Respondent promised to send some documents to her the following afternoon. Respondent finally e-mailed some documents to Schmitz on July 28,

2004. Schmitz completed the documents and faxed them back to respondent the following day.

{¶ 6} During August 2004, Schmitz left numerous telephone messages for respondent, but he never returned the calls. On September 17, 2004, respondent's secretary e-mailed some documents to Schmitz, who completed them and returned them to respondent. Respondent never filed the forms.

{¶ 7} On September 26, 2004, Schmitz drove from Illinois to respondent's office in Cincinnati to confront him about his poor performance and lack of communication. Respondent told Schmitz that everything was progressing and that he would send all the documents within a week. Respondent never sent the documents and stopped communicating with Schmitz.

{¶ 8} On November 11, 2004, Schmitz sent respondent an e-mail terminating his services and requesting a refund, but respondent did not reply. Respondent never earned the $2,000 fee, but he had a negative balance in his client trust account as of January 31, 2005. On March 16, 2005, respondent testified falsely under oath that he had refunded Schmitz's $2,000 retainer and that he had a copy of the refund check. One year later, respondent sent Schmitz a check for $2,000.

{¶ 9} The board found that respondent's actions violated the following Disciplinary Rules: DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(6) (barring conduct that adversely reflects on a lawyer's fitness to practice law), 2–106(A) (prohibiting a lawyer from agreeing to charge or collecting an illegal or clearly excessive fee), 2–110(A)(3) (requiring a lawyer to promptly return unearned fees upon withdrawal from employment), 6–101(A)(3) (prohibiting a lawyer from neglecting an entrusted legal matter), 9–102(B)(4) (requiring a lawyer to promptly repay funds that the client is entitled to receive), and 9–102(E)(1) (requiring a lawyer to maintain client funds in an interest-bearing trust account).

## Count II

{¶ 10} On September 19, 2003, Tressa Patton met with respondent to discuss the possibility of filing for divorce. That same day, Patton paid respondent $200 toward a $750 retainer. In April 2004, Patton paid respondent the remaining $550 and authorized respondent to file the divorce.

{¶ 11} Between May 2004 and April 2005, Patton left numerous messages for respondent inquiring about the status of her case, but respondent rarely returned the calls. In an April 7, 2005 e-mail, Patton terminated the representation and requested a refund of the full $750 retainer. Respondent replied by e-mail and falsely stated that he had sent Patton a refund check.

{¶ 12} After she failed to receive the promised refund, Patton again inquired about it. Respondent falsely replied, "I will check to see when the *second* check

went out." When Patton inquired as to why a second check was sent, respondent replied by e-mail with the false statement, "The first check was sent to the wrong address so I cancelled the check and sent out a second."

{¶ 13} From late April 2005 through May 2005, Patton tried repeatedly to contact respondent by phone and e-mail, but he never replied. On March 14, 2006, respondent sent Patton a check for $750.

{¶ 14} The board found that respondent's actions violated DR 1–102(A)(4), 1–102(A)(6), 2–106(A), 2–110(A)(3), 6–101(A)(3), and 9–102(B)(4).

## Count III

{¶ 15} In July 2004, Rachelle Napier retained respondent to represent her in an uncontested divorce. Napier paid respondent $100 toward a $506 retainer in January 2005, and then she paid the balance in March 2005.

{¶ 16} Respondent instructed Napier and her husband to attend a parenting class, which they completed in April 2005. Respondent then told Napier that a final divorce hearing would be scheduled in 30 to 60 days. After two months had passed, Napier tried to contact respondent but was unsuccessful.

{¶ 17} On July 1, 2005, Napier called Butler County Family Services, only to learn that the divorce paperwork had never been filed. On that same day, Napier called respondent, who falsely asserted that he had in fact filed the paperwork. Respondent scheduled an appointment with Napier for July 5, 2005. That morning, respondent called Napier and told her that there was no need for the appointment.

{¶ 18} On July 8, 2005, Napier again called Butler County Family Services and learned that respondent still had not filed a divorce complaint for her in Butler County. Napier then called respondent and told him that she no longer wanted his services, and she requested a refund of the retainer. On July 13, 2005, Napier sent a letter to respondent formally terminating the representation and requesting the refund. She also filed a grievance with relator. After respondent received a copy of the grievance, he contacted Napier and promised to file the divorce paperwork for her and to refund the retainer. Respondent did file the paperwork, but failed to return the retainer until eight months later.

{¶ 19} The board found that respondent's actions violated DR 1–102(A)(4), 1–102(A)(6), 2–110(A)(3), 6–101(A)(3), and 9–102(B)(4).

## Count IV

{¶ 20} On November 12, 2004, Dennis Quinlan retained respondent to represent him in a divorce. Quinlan paid respondent a $1,000 retainer and agreed to

pay an additional $1,000 the following month. Time was of the essence because Quinlan's wife had left with the couple's only child.

{¶ 21} On November 18, 2004, respondent filed paperwork on Quinlan's behalf with the Warren County Domestic Relations Court, but errors in the paperwork prevented the court from accepting it. By letter dated November 23, 2004, a clerk at the Warren County Domestic Relations Court informed respondent of the problems with the paperwork, but respondent failed to reply.

{¶ 22} When Quinlan was unable to contact respondent, he called the Warren County Domestic Relations Court to check the status of his divorce case. A judge's secretary told Quinlan that there was a problem with the paperwork and that respondent was aware of the problem. Quinlan then tried to call respondent about the problem but was unable to reach him. On November 24, Quinlan sent respondent a letter about the problem with the paperwork.

{¶ 23} Sometime after that date, respondent asked Quinlan to come to respondent's office to sign corrected paperwork, and Quinlan did so. Respondent promised to file the paperwork the next day, but he never did.

{¶ 24} On December 8, Quinlan's wife filed for divorce. On December 13, after consulting with another attorney, Quinlan sent respondent a certified letter terminating respondent's services and requesting a refund of the unused portion of the retainer. Two days later, Quinlan went to respondent's office to request the refund.

{¶ 25} Respondent told Quinlan that he needed one or two weeks to tally up Quinlan's bill and to issue any refund owed. Respondent failed to provide a prompt refund or an itemized bill to Quinlan, and it was not until 15 months later—on March 14, 2006—that respondent sent Quinlan a check for $1,000.

{¶ 26} The board found that respondent's actions violated DR 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1–102(A)(6), 2–110(A)(3), 6–101(A)(3), 9–102(B)(3) (requiring a lawyer to maintain complete records of all funds of a client and to render appropriate accounts), and 9–102(B)(4).

## Count V

{¶ 27} In January 2004, Terri Kemper retained respondent to represent her in a marriage dissolution. Respondent told Kemper that he would charge her a $600 flat fee, plus $250 for filing fees and $300 for an independent firm to complete her Qualified Domestic Relations Order ("QDRO"). Kemper made a $500 downpayment and agreed to pay an additional $100 within 60 days.

{¶ 28} Relator alleges that Kemper informed respondent that she was eligible to receive benefits under her husband's retirement plan beginning May 1, 2004.

Although respondent does not contest the allegation, he has no specific recollection on the issue. He believes that he would have informed Kemper that she was eligible to receive benefits either when her husband was eligible to retire or when he actually did retire.

{¶ 29} Respondent told Kemper that if she could obtain the necessary paperwork, he could prepare and file her separation agreement within one week. Within two weeks, Kemper provided respondent all of the documents that he requested.

{¶ 30} Over the next six months, Kemper repeatedly called respondent's office to check on the status of her case. Respondent rarely returned the calls, and his secretary offered various excuses for the delay.

{¶ 31} At some point during that six-month period, Kemper scheduled an appointment with respondent. When Kemper arrived at the office, the doors were locked, and no one was there. Kemper waited for an hour, but respondent never arrived for the appointment.

{¶ 32} When Kemper was finally able to meet with respondent, she expressed her concerns about the delays in her case. Kemper asked respondent to verify that her husband's union had accurately represented the amount of income that she could expect to receive each month from her husband's retirement plan because she was relying on that figure to obtain a mortgage. Respondent reviewed the union's letter and confirmed to Kemper that she would receive $1,205.72 each month.

{¶ 33} After several weeks, respondent's secretary told Kemper that her separation agreement had been filed and that a court date had been set for September 1, 2004. Kemper and her husband appeared for the hearing, but respondent failed to attend. When Kemper returned home, she found a message that respondent had left on her answering machine 30 minutes before the hearing, saying that he could not attend the hearing that day. Respondent promised to reimburse Kemper $160 for her lost time, but he never did so.

{¶ 34} Approximately two weeks later, respondent did attend a rescheduled court hearing in Kemper's case. After the hearing, respondent told Kemper that she would receive a dissolution decree within two weeks. After waiting two weeks, Kemper again started calling respondent to check on the status of the dissolution, but respondent did not reply.

{¶ 35} Kemper evidently contacted her husband's employer and learned that respondent had never submitted a QDRO. Kemper called respondent and expressed concern that he had not hired an independent firm to complete the QDRO. Respondent falsely stated to Kemper that he was under the impression

that Kemper was going to complete the QDRO on her own. Respondent then completed the QDRO and submitted it to the court.

{¶ 36} In December 2004, Kemper began receiving her distribution from her husband's retirement plan in the amount of $1,205.72 per month. Two months later, Kemper received a call from her husband's union stating that the QDRO was incorrectly worded and that she was entitled to only $500 per month. The union also told Kemper that the payments would be halted until the matter was rectified.

{¶ 37} Kemper immediately called respondent, who said that he would correct the language within 10 days. After 10 days, Kemper began calling and e-mailing respondent, but he rarely replied. When respondent spoke with Kemper, he assured her that he would hire QDRO Consultants, Inc. to prepare the new QDRO within one week, and respondent said that he would pay that company's fee out of his own pocket. Several weeks passed with no word from respondent.

{¶ 38} In April 2005, Kemper called QDRO Consultants, Inc. and learned that the new QDRO had been completed but that the company was still waiting to be paid by respondent. When Kemper called respondent with this news, he falsely told her that he had sent a check to the company three weeks earlier. Kemper confirmed that QDRO Consultants, Inc. had never received a check from respondent and then made arrangements to pay for the new QDRO herself. Before Kemper sent the $400 check to the company, she learned that respondent had finally made the necessary payment. Because of respondent's conduct, Kemper suffered financially.

{¶ 39} The board found that respondent's actions violated DR 1–102(A)(4), 1–102(A)(6), and 6–101(A)(3).

*Count VI*

{¶ 40} On September 24, 2004, Heather Lamb–Cromwell retained respondent to represent her in a divorce. Lamb–Cromwell paid respondent a $1,700 retainer, and respondent agreed to charge her $150 per hour. Respondent told Lamb–Cromwell that if she could deliver all of the necessary documentation to him, he could file a complaint for divorce within one week.

{¶ 41} In early October 2004, Lamb–Cromwell learned that her case had not been filed. She also learned that respondent had submitted a complaint for divorce, but the court had rejected it because it did not conform to the local rules. Lamb–Cromwell tried to contact respondent to tell him about the problem, but she was only able to leave messages with his secretary. On October 19, 2004, respondent filed a revised complaint.

{¶ 42} By November 1, 2004, respondent had a $236.92 balance in his client trust account. One month later, the account balance had fallen to $27.74.

{¶ 43} At a January 2005 pretrial conference, respondent appeared unprepared, and the court rescheduled the conference for March 8, 2005. On January 5, 2005, respondent failed to keep an appointment with Lamb–Cromwell. When respondent did meet with Lamb–Cromwell five days later, he advised her to remain in the marital home.

{¶ 44} The following month, Lamb–Cromwell told respondent that her husband was acting inappropriately and that she could no longer tolerate living in the marital home. Nonetheless, respondent instructed Lamb–Cromwell to remain in the home. At a pretrial conference in March 2005, the judge refused to award temporary child support to Lamb–Cromwell because she was still residing in the marital home.

{¶ 45} The following day, Lamb–Cromwell fired respondent and asked for an itemized bill, as well as the return of her file and a refund of the unused retainer. She made multiple trips to respondent's office, but the materials were never there. In April 2005, respondent's secretary met Lamb–Cromwell off Interstate 71 and gave her the case file.

{¶ 46} In June 2005, Lamb–Cromwell advised respondent that if she did not receive an itemized bill and the unused portion of the retainer, she would file a grievance against him. Respondent then agreed to give her a full refund, and he sent her a personal money order in the amount of $500. Respondent never provided Lamb–Cromwell an itemized bill.

{¶ 47} The board found that respondent's actions violated DR 1–102(A)(6), 2–106(A), 2–110(A)(3), 6–101(A)(3), 9–102(B)(3), 9–102(B)(4), and 9–102(E)(1).

## Count VII

{¶ 48} On December 10, 2005, Michelle Pryor retained respondent to assist her in obtaining a dissolution of her marriage. Pryor paid respondent $500 in legal fees, as well as $250 for filing fees. Pryor provided respondent all of the paperwork necessary to file a separation agreement for her, but respondent failed to file the papers. Pryor left many voicemail messages for respondent, but he rarely returned her calls. Eventually, respondent's office telephone was disconnected, and his office appeared to be vacant when Pryor stopped there. Respondent never filed for dissolution on Pryor's behalf, but Pryor did reimburse Pryor in full on March 14, 2006.

{¶ 49} The board found that respondent's actions violated DR 1–102(A)(6) and 6–101(A)(3).

## Count VIII

{¶ 50} Rachel Schlosser purchased a standardized "Dissolution with Children Forms" kit from respondent's website. Schlosser paid respondent $140 for the

forms kit and $250 in filing fees. Respondent reviewed the forms based on the information Schlosser provided, but he never filed for a dissolution on her behalf.

{¶ 51} Schlosser tried to contact respondent several times, but respondent rarely returned the calls. When he did, he made excuses for the delay. After several more weeks, respondent contacted Schlosser and told her that she had not filled out the paperwork properly. Schlosser asked respondent to return the paperwork and the filing fee to her. Respondent said that he would do so, but he never returned the paperwork. On March 17, 2006, respondent did refund $250 to Schlosser.

{¶ 52} The board found that respondent's actions violated DR 1–102(A)(6) and 6–101(A)(3).

## Count IX

{¶ 53} On December 2, 2005, this court suspended respondent's license to practice law because he had failed to comply with the biennial attorney-registration requirement in Gov.Bar R. VI. See *In re Friedman*, 107 Ohio St.3d 1431, 2005-Ohio-6408, 838 N.E.2d 671. On February 24, 2006, we reinstated respondent's license to practice law after he had complied with the attorney-registration requirement. See *In re Miscellaneous Order*, 108 Ohio St.3d 1491, 2006-Ohio-1050, 843 N.E.2d 796. Between December 2, 2005, and February 24, 2006, respondent practiced law while his license was under suspension.

{¶ 54} The board found that respondent's actions violated DR 3–101(B) (prohibiting a lawyer from practicing law in violation of the professional regulations of a jurisdiction) and Gov.Bar R. VI(6)(C) (prohibiting an attorney from practicing law in Ohio when the attorney has been summarily suspended for failing to register with the Attorney Registration Section).

## Sanction

{¶ 55} Relator and respondent jointly recommended a two-year suspension from the practice of law, with the final six months of the suspension stayed on condition that respondent comply with a contract with the Ohio Lawyers Assistance Program ("OLAP"). The panel and the board adopted that recommendation, but with additional conditions. Respondent has filed no objections to the board's findings or its recommendation.

{¶ 56} We have reviewed the board's report and the record, and we find that respondent violated all of the provisions as described above. We also adopt the board's recommended sanction.

{¶ 57} In imposing a sanction for attorney misconduct, we consider the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of

Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). The aggravating factors in this case include the pattern of misconduct and respondent's multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d).

{¶ 58} Mitigating factors identified by the board in this case include the absence of any prior disciplinary record, respondent's full and free disclosure to the board and his cooperative attitude toward the disciplinary proceedings, his good character and reputation, and other interim rehabilitation. BCGD Proc. Reg. 10(B)(2)(a), (d), (e), and (h).

{¶ 59} The board also found that respondent had suffered from a diagnosed chemical dependency to drugs and alcohol that had contributed to his misconduct, and the board also found that he had successfully completed an approved treatment program. BCGD Proc.Reg. 10(B)(2)(g). Patrick Garry, an associate director of OLAP, testified at the disciplinary hearing that respondent had been treated for drug and alcohol addictions after respondent acknowledged in October 2005 that he was an alcoholic and a drug addict. Garry stated at the disciplinary hearing in September 2006 that respondent could return to the practice of law "[i]f he does the things he's doing now and has been doing for the last 11 months."

{¶ 60} After weighing the aggravating and mitigating factors in this case, we agree with the parties and the board that respondent should be suspended from the practice of law for two years, with the final six months of that suspension stayed on conditions. Respondent's arrest in October 2005 for possession of cocaine appears to have marked a turning point in his life and his career, and the treatment regimen that he started soon thereafter for his cocaine and alcohol addictions is a good beginning. Respondent testified at the disciplinary hearing that he has been sober since October 2005, and he stated that he attends daily meetings with a network of people to whom he can turn for help and support. Respondent also expressed "tremendous regret" for his misconduct, and he pledged to pay full restitution to his clients, including the repayment of all of the retainer paid by Heather Lamb–Cromwell and compensation to Terri Kemper for the wages that she lost when she came to court for a hearing that respondent failed to attend.

{¶ 61} A two-year suspension with the final six months stayed will appropriately protect the public, provided that respondent continues his daily efforts at maintaining sobriety.

{¶ 62} We have imposed a similar sanction in other cases. See, e.g., *Muskingum Cty. Certified Grievance Commt. v. Greenberger*, 108 Ohio St.3d 258, 2006-Ohio-790, 842 N.E.2d 1042 (imposing a two-year suspension, with the final six months stayed, when an attorney who had no history of disciplinary problems failed to appear at a court hearing, neglected several legal matters, placed a

client's funds in his office operating account, and failed to account for a client's funds); *Disciplinary Counsel v. Jaffe,* 102 Ohio St.3d 273, 2004-Ohio-2685, 809 N.E.2d 1122 (attorney's attempt to conceal her repeated neglect of clients' cases warranted a two-year suspension, with the second year conditionally stayed, in light of mitigating circumstance that attorney had been suffering from serious depression); *Disciplinary Counsel v. Grdina,* 101 Ohio St.3d 150, 2004-Ohio-299, 803 N.E.2d 392 (a two-year suspension, with one year conditionally stayed so long as attorney continued to comply with an OLAP contract, was the appropriate sanction for the attorney's neglecting client matters, misrepresenting to a client that the attorney had filed papers in probate court, paying personal bills from funds deposited in a client trust account, and failing to cooperate in a disciplinary investigation).

{¶ 63} Accordingly, respondent is hereby suspended from the practice of law in Ohio for two years, with the final six months stayed on conditions. During the two-year suspension period, respondent shall (1) continue to comply with the terms of his OLAP contract, (2) be evaluated by a mental health professional and follow any recommended course of treatment, (3) provide a report from a psychologist or psychiatrist certifying that he is fit to resume the practice of law in Ohio, (4) pay additional restitution of $160 to Terri Kemper and $1,200 to Heather Lamb–Cromwell, and (5) commit no further disciplinary violations. If respondent violates the terms of the stay, the stay shall be lifted, and respondent shall be suspended for the full two-year period of suspension. Moreover, if reinstated, respondent shall serve, as an additional condition of the stay, a Gov.Bar R. V(9) period of probation until October 2010 with the following conditions: (1) respondent must successfully complete his OLAP contract, (2) respondent shall continue to be evaluated and follow the course of treatment recommended by a mental health professional, (3) respondent shall submit a report from a mental health professional certifying that he is fit to practice law, and (4) respondent shall commit no further misconduct. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER and CUPP, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Assistant Disciplinary Counsel, for relator.

Kettlewell & Kettlewell L.L.C., and Charles J. Kettlewell, for respondent.